Senator William H. HERNSTADT,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Alfa Broadcasting Company, Intervenor.

No. 80–2228.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 17, 1980.

Decided Oct. 18, 1980.

Issued March 27, 1981.

Robert W. Healy, Washington, D. C., with whom Larry A. Miller, Washington, D. C., was on the brief, for petitioner.

Lisa B. Margolis, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, C. Grey Pash, Jr., Counsel, F. C. C., and Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

John I. Stewart, Jr., Washington, D. C., with whom Victor E. Ferrall, Jr., Washington, D. C., was on the brief, for intervenor, Alfa Broadcasting Co.

Before WALD, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Senator William H. Hernstadt sought re-election to the Nevada state senate in the 1980 elections. As a candidate for public office, he tried to purchase advertising time from Alfa Broadcasting Company (Alfa), the operator of station KTNV–TV in Las Vegas. Although Alfa was willing to sell the Senator advertising time, it would only sell him "fixed position" spots rather than "run-of-station" (ROS) spots. ROS spots sell for substantially less than fixed position spots because broadcasters do not guarantee that the former will run at any fixed time, or that they will run at all. As their name suggests, ROS spots are shown at the convenience of the broadcaster, to fill in time that would otherwise be unused.

When Alfa refused to sell him ROS spots, Senator Hernstadt filed this complaint with the Complaints and Compliance Division of the Broadcast Bureau of the Federal Communications Commission (FCC or Commission) in August, 1980. He alleged that Alfa

was violating section 315(b)(1) of the Communications Act of 1934 (the Act), 47 U.S.C. § 315(b)(1) (1976). The Complaints and Compliance Division ruled that Alfa did not have to sell Senator Hernstadt ROS spots because the Act does not give nonfederal candidates a right of access to any given type of broadcast time.

The Senator sought review before the Commission. On October 3, 1980, the FCC affirmed the Bureau's decision in a memorandum decision and order.[1] Senator Hernstadt petitioned for review of that order to this court. Because the November 4, 1980, election was imminent, the petition was expedited and oral argument was heard on October 17, 1980. On October 18, 1980, a judgment was entered reversing the Commission. The judgment directed the FCC to order Alfa to make ROS rates available to Senator Hernstadt.[2] This opinion explains the basis of that judgment.

## I. THE LANGUAGE OF THE STATUTE

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor*

*Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Section 315(b)(1) of the Act provides that during the last forty-five days before a primary election, or the last sixty days before a general election, broadcasters may not charge candidates more than

the lowest unit charge of the station for the same class and amount of time for the same period . . . .[3]

Senator Hernstadt argues that ROS is a charge and that he must be offered ROS rates because this section entitles him to purchase time at a station's "lowest unit charge." Alfa argues that ROS spots are a "class" of time, and that, under the terms of the Act, Alfa must sell the Senator time at the lowest unit charge for the proffered class, but need not sell him any particular class of time. Because neither "class" nor "charge" is defined by the statute, the ambiguous use of these terms cannot be resolved by a simple reference to statutory language.

When a statute's meaning is ambiguous, the paramount rule of statutory construction gives the statute that meaning which fulfills the purpose and intent of the legis-

---

1. *Hernstadt v. Alfa Broadcasting Co.*, FCC No. 80-574 (Oct. 3, 1980). The decision below is discussed in text at notes 26–31 *infra*.

2. *Hernstadt v. FCC*, 677 F.2d 893 (D.C.Cir. 1980) (per curiam):

   JUDGMENT

   This cause came on for consideration of a petition for review of a decision by the Federal Communications Commission (FCC), and was argued by counsel. The petition was expedited because the outcome affects the general election to be held November 4, 1980. On consideration of the foregoing, it is hereby

   ORDERED AND ADJUDGED by this Court that, for the reasons expressed in an opinion to be issued at a later date, the decision of the FCC reviewed in this case is hereby reversed and the case is remanded to the FCC for entry of an order consistent with this judgment, and for such further deliberations as may be necessary.

   We hold that, on the facts of this case, the Commission erred in construing section 315(b)(1) of the Communications Act of 1934, as amended, current version at 47 U.S.C.

   § 315(b)(1) (1976), so as to find that Senator Hernstadt was not entitled to run-of-schedule rates. Accordingly, Senator Hernstadt, upon his request, must be afforded run-of-schedule rates. His spot announcements will be subject to the same time vagaries as would those of any commercial advertiser purchasing such service.

3. Act § 315(b)(1), 47 U.S.C. § 315(b)(1) (1976). Section 315(b) states, in its entirety:

   The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election to such office shall not exceed—

   (1) during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and

   (2) at any other time, the charges made for comparable use of such station by other users thereof.

lature. *See, e.g., Haggar Co. v. Helvering,* 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940). We therefore begin our analysis by examining the purpose and intent of Congress when it adopted section 315(b)(1) in 1972. And because the construction suggested by this analysis is inconsistent with the decision of the agency charged with enforcing the statute, we review the basis of the agency's interpretation of these technical terms.

## II. THE LAW PRIOR TO THE 1972 AMENDMENTS

The present version of section 315(b) was enacted in 1972 as an amendment to an earlier provision dealing with advertising rates for political candidates, and analysis of congressional intent in 1972 must begin with an understanding of the law Congress meant to change. That law was enacted in 1952 when Congress initially addressed rates charged political candidates:

> The charges made for the use of any broadcasting station for any of the purposes set forth in this section [facilities for candidates for public office] shall not exceed the charges made for comparable use of such station for other purposes.[4]

This "comparable use" provision was designed to protect candidates from discriminatory rates,[5] and is still applicable to rates charged candidates at times other than immediately before elections.

The first regulation interpreting this provision was promulgated in 1963. It stated that the comparable use provision entitled candidates to all discounts available to other advertisers:

> All discount privileges otherwise offered by a station to commercial advertisers shall be available to all candidates for public office.[6]

Stations charge a wide variety of advertising rates, many of which might be considered discounts under this regulation. Most stations give bulk and frequency (or volume) discounts to advertisers who purchase many announcements. In addition, stations typically offer three rate categories to advertisers who purchase spots that will not necessarily run at any fixed time. The cheapest of these categories is associated with ROS spots which run, if at all, at the convenience of the station; ROS spots can be scheduled at the last minute on an ad hoc basis to fill in gaps in a program schedule. The other two rate categories apply to "preemptible" and "immediately preemptible" spots. A "preemptible" spot is scheduled for a specific time, but the station retains the right to sell the spot to a higher bidder. The original purchaser must receive notice that his announcement is being preempted, and he may also have the right to pay a higher rate to preserve his slot. "Immediately preemptible" spots are cheaper than preemptible spots because they can be sold to a higher bidder without notice and with no option to buy. All three of these rate categories—preemptible, immediately preemptible, and ROS—are cheaper than fixed position spots, which run at a guaranteed time.

The 1963 regulation did not define "discount privileges" and did not indicate which rate categories must be available to candidates as discounts. There was never any doubt that candidates were entitled to volume and frequency discounts on a comparable use basis—that is, if a candidate purchased in bulk, he was entitled to the same discount available to other bulk purchasers. And the FCC construed "discount privileges" as including ROS and similar rates in subsequent cases.

---

**4.** Communications Act Amendments of 1952, Pub.L.No. 82–554, § 11, 66 Stat. 717 (amending § 315 of the Communications Act of 1934), 47 U.S.C. § 315(b)(2) (1976).

**5.** In 1953, there were tales of "political" rates for the use of print media, rates often twice the normal rate, and similar problems existed with respect to the use of electronic media in elec-

tion campaigns. Against this backdrop, the "comparable use" provision was enacted to ensure that candidates were not charged "more than the . . . commercial rate charged to others." 98 Cong.Rec. 7415 (1952) (remarks of Rep. McCormack).

**6.** 28 Fed.Reg. 13,572 (1963) (current version at 47 C.F.R. § 73.1940(b)(2) (1979)).

The first of these cases was *Triangle Publications, Inc.*, 23 F.C.C.2d 760 (1967). In that decision, the FCC merely stated that ROS spots are "discount privileges within the meaning of section 73.120(c)(1) of our rules and therefore should be made available to candidates to the extent available to the commercial advertisers." *Id.* at 760.[7] The Commission gave a more complete explanation of the *Triangle* decision in *WHDH, Inc.*, 23 F.C.C.2d 763 (1967), though that case involved preemptible, rather than ROS, rates. In *WHDH*, the Commission held that preemptible rates given to other advertisers must be offered to political candidates because "making available to com-

mercial advertisers two rates for spots while making only the higher rate available to candidates does not comply with the requirements of the statute." *Id.* at 764.[8]

This rationale applied equally to ROS and preemptible[9] rates. If a station was willing to sell a candidate one minute of time between 8:00 p. m. and 11:00 p. m., but only at fixed position rates, and sold other advertisers such minutes on an ROS or preemptible basis, then the candidate was not being offered the rates available to others making comparable use of the station. It is against the background of these decisions[10] that the Ninety-Second Con-

7. In *Triangle*, station WFBG of Altoona, Pennsylvania, wrote to the FCC asking whether the policy of not making run of schedule spot announcements available to political candidates violated § 315(b)(1). The station explained that these spots were "carried at the station's convenience and discretion, without any guarantee of placement, and are available to commercial advertisers at a reduced rate under a package agreement." 23 F.C.C.2d at 760. The FCC replied that "[s]ince the licensee sells spots to political candidates and makes ROS spot announcements available to commercial advertisers, it is our holding that it must make the latter available to candidates on the same basis." *Id.* The FCC then quoted the relevant portions of the statute and the regulation, and concluded that "ROS spots are discount privileges within the meaning" of the regulation. *Id.*

8. In *WHDH*, stations WHDH, WHDH–FM, and WHDH–TV of Boston, Massachusetts, wrote to the FCC asking whether their policy of not making preemptible spot announcements available to candidates for public office violated § 315. The station described its preemptible spots as sold on the basis of

time availability, and the purchase orders specify the times at which the spots will be aired. There is no difference between the periods of the broadcast day in which these spots are broadcast and these [*sic*] in which nonpreemptible spots are aired, and the purchaser of either type of spots initially has the same right of selection of available time. The only difference being that a purchaser of nonpreemptible spots has available to him time occupied by preemptible spots in addition to other available time. If a preemptible spot is canceled because of preemption, no charge is made therefor. The charge for preemptible spots is lower than for nonpreemptible spots.

23 F.C.C.2d at 763. As in *Triangle*, the FCC supported its decision by quoting the statute and the regulation, and then concluded with the rationale quoted in text. *Id.* at 763–64.

9. "Preemptible" is used hereafter to refer to both "preemptible" and "immediately preemptible" terms.

10. *See also Use of Broadcast Facilities by Candidates for Public Office*, 24 F.C.C.2d 832 (1970). This fifty-four page "primer" was published in 1970 and discussed all aspects of the use of broadcast facilities by candidates for public office. The Commission described the primer as "a compilation of the Commission's interpretive rulings under section 315 of the Communications Act of 1934, as amended, and the Commission's rules implementing that section of the Act." *Id.* at 832.

The "primer" is in the form of questions and answers. One answer discusses whether candidates have a right to ROS terms under the comparable use provision:

Since the licensee sells spots to political candidates and makes packages of ROS spots (discount privileges within the meaning of § 73.120(c)(1) of the Rules) available to its commercial advertisers, it must make ROS spots available to political candidates on the same basis. However, if one candidate purchases ROS spots which are broadcast, equal opportunity does not require that the licensee sell his opponents fixed position spots for the same time periods at ROS spot rates. Equal opportunity requires that other candidates be permitted the opportunity to buy an equivalent number of ROS spots at the same price and on the same conditions as the first candidate, or that they be afforded comparable time periods to those actually used by the first candidate at the prescribed rates for such time periods. If ROS spots were chosen by the other candidates the licensee would be

gress turned its attention to rates charged political candidates under section 315.

## III. LEGISLATIVE INTENT OF THE 1972 AMENDMENTS

In 1952, Congress had been concerned about the rate discrimination practiced by some broadcasters against political candidates. In 1972, Congress focused on rates themselves. The catalyst for action in 1972 was not a problem with the way rates were calculated, but rather concern about the increasing cost of election campaigns. Broadcast rates were, of course, one element in the rising cost of running for office. In 1972, in order to correct this situation, and to implement other reforms designed to preserve the integrity of elections, Congress passed the Federal Election Campaign Act of 1971, "a comprehensive approach to the problem of political campaign reform and excessively high campaign costs. Its provisions deal with the communications media, campaign contributions, disclosure and reporting requirements, and tax incentives to encourage the small donor to contribute to the candidate or party of his choice." S.Rep.No.96, 92d Cong., 1st Sess. 33 (1971). This Act amended section 315(b): the comparable use provision remained in effect during non-election periods, but during pre-election periods, a new "lowest unit charge" provision guaranteed candidates the "lowest unit charge of the station for the same class and amount of time for the same period." [11] Clearly the new pre-election provisions were viewed as providing an additional break for candidates.

Given the broad purposes of the Act and its subject matter, it is not surprising that it excited great interest and that many modifications were made during the debates and at conference. Changes of this nature often result in ambiguous statutory language, the meaning of which cannot be determined by a simple reference to either the words of the statute or its legislative history. The legislative process is, perhaps necessarily, incremental, and it is not always possible to reconcile the meaning of a provision with the intent of each party to a compromise or debate. This difficulty is especially acute when a provision is the result of a floor amendment. Such amendments are often fashioned quickly, during debate, with little time spent in careful drafting.

Although the ambiguous term "class" in section 315(b)(1) is the result of just such an amendment, the legislative history provides some guidance to its proper interpretation. Indeed, three aspects of the legislative history—the specific history of the section itself, the purposes served in regulating rates charged political candidates, and the simultaneous reenactment of the comparable use provision—point in a single direction: candidates are entitled to ROS and preemptible rates if the station offers such rates to other advertisers.

### A. Legislative History of Section 315(b)(1)

### 1. The Original Wording

The lowest unit charge provision originated in the Senate version of the 1971 election reform bill.[12] During the previous

required to act in good faith and scrupulously follow normal procedures in the allotment of these ROS spots. (In re WFBG, 23 F.C.C.2d 760 (1967); See the Commission's rules, 47 C.F.R., §§ 73.120(c)(1), 73.290(c)(1), 73.-657(c)(1) and 74.1113(b)(1) (1970); Q. and A. VIII 6, *supra* ). *Id.* at 880–81.

11. *See* text of § 315(b), quoted in full in note 3 *supra.* Throughout this opinion, "pre-election period" is used to refer to the period of time during which § 315(b)(1) is operative: "the forty-five days preceding the date of a primary or

primary runoff election and . . . the sixty days preceding the date of a general or special election." Act § 315(b)(1), 47 U.S.C. § 315(b)(1) (1976). "Non-election period" describes the period of time during which § 315(b)(2) is operative: "any other time." *Id.* § 315(b)(2).

12. Although the House version of the 1971 bill did not include an analogous provision, several unenacted bills presented to the Ninety-First Congress contained provisions designed to lower the rates charged candidates for broadcast time. *See, e.g., The Campaign Broadcast Reform Act of 1969: Hearings on S. 2876 Before*

session, the Senate Commerce Committee had considered various proposals designed to decrease media expenses for candidates in several ways, including "voters' time," allocated for use of politicians without charge,[13] and fixed discounts of up to eighty percent for political advertisements.[14] These proposals were vigorously debated and, in the end, rejected.

As reported from committee, section 315(b)(1) provided that the charges for use of broadcast time during the preelection period were not to exceed "the lowest unit charge of the station for the same amount of time during the same period." S.Rep. No.96, 92d Cong., 1st Sess. 2 (1971). The Senate report explained that the provision would "place the candidate on par with a broadcast station's most favored commercial advertiser" during the pre-election period, and that "comparable" rates would continue to be available during other periods. Id. at 27. This scheme was seen as a better way of reducing rates than a fixed discount for political candidates. Rather than imposing one arbitrary discount on all stations no matter how differently situated, the lowest unit charge provision would entitle candidates only to the discount a station was already giving its most favored advertisers. It was thought that this provision would lower the rates charged candidates without imposing unreasonable and possibly economically devastating burdens on small stations.[15]

The Senate report went on to discuss the discounts that would be available under the lowest unit charge provision. The report

noted that the lowest unit charge for a prime time spot would often be a preemptible rate:

Except in cases where other factors, such as additional volume discounts, would result in a lower cost to the candidate, the bill would provide that the highest rate a broadcast station could charge the candidate for fixed time for political campaign purposes would be the prevailing immediately preemptible rate.

Id. at 28. The report then explained that volume discounts and ROS packages available at a particular station might result in even lower rates. Id. Thus, a candidate purchasing a fixed spot of prime time could only be charged the amount charged another sponsor who received such time on a discount basis, even though that discount was available solely because the other advertiser was not guaranteed a fixed time slot. Similarly, the "lowest unit charge" language entitled a candidate to volume and frequency discounts offered bulk purchasers even though the candidate purchased only a single spot.

### 2. The Floor Amendment

Before the Senate committee and in the report, Senator Ted Stevens expressed "serious reservations" about the lowest unit charge provision. See, e.g., id. at 97. On the Senate floor, he voiced two specific objections to the new provision: he did not think candidates should be given volume and frequency discounts to which they were not entitled on a comparable use basis, and he did not think they should be given fixed

---

the Communications Subcomm. of the Senate Comm. on Commerce, 91st Cong., 1st Sess. 2 (1969) (congressional candidates entitled to certain amounts of time at rates 20 to 30% of the rates charged others); Political Broadcasting—1970: Hearings on H.R. 13721, H.R. 13722, H.R. · 13751, H.R. 13752, H.R. 13935, H.R. 14047, H.R. 14511, and S. 3637 Before the Subcomm. on Communications and Power of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess. 4 (1970) (the House bills entitled congressional candidates to certain time at 20 to 30% of its normal cost; the Senate bill entitled candidates to "the lowest unit charge of the station for the same amount of time in the same time period").

13. See The Campaign Broadcast Reform Act of 1969: Hearings on S. 2876 Before the Communications Subcomm. of the Senate Comm. on Commerce, 91st Cong., 1st Sess. 29 (1969).

14. See, e.g., id. at 894.

15. See, e.g., S.Rep.No.96, 92d Cong., 1st Sess. 27 (1971); Federal Election Campaign Act of 1971: Hearings on S. 1, S. 382, and S. 956 Before the Subcomm. on Communications of the Senate Comm. on Commerce 412 (1971) (remarks of Sen. Pastore).

prime time at ROS or preemptible rates. *See* 117 Cong.Rec. 29,026 (1971).

Although Senator Stevens was unable to dissuade his colleagues from giving candidates volume and frequency discounts, the bill was amended to meet his second objection. Senator Stevens explained that, as reported from committee, section 315(b)(1) would entitle candidates to discount rates for fixed prime time—even though no one else could get such time at a discount:

> [T]he politician will walk in and *get prime time* that is worth $300 if anyone else were to buy it—and believe me, they do buy it—*and that time is put aside for them* and they pay only $100.[16]

Despite the language of the committee report, discussed above, Senator Pastore did not think the provision would entitle candidates to one class of time at rates applicable to another class.[17] Senator Pastore was, therefore, willing to agree to an amendment, proposed by Senator Stevens, preserving volume and frequency discounts, but clearly indicating that candidates are not entitled to purchase fixed prime time at discount rates. This was accomplished by adding the reference to "class" of time, and it produced the version of the statute finally enacted: "lowest unit charge of the station for the same *class and* amount of time

---

**16.** 117 Cong.Rec. 29,027 (1971) (emphasis added). The debate on the need for, and meaning of, the Stevens amendment was rather extensive, but unfortunately most of it adds little to our understanding of what the Senators meant when they used the term "class of time." Initially, Senator Stevens proposed an amendment that would have eliminated volume and frequency discounts as well as the sale of one class of time at rates applicable to another class. During the debate on this amendment, the following colloquy took place:

> Mr. STEVENS . . . .
>
> What the Senator from Rhode Island is really saying is that the politician will walk in and *get prime time* that is worth $300 if anyone else were to buy it—and believe me, they do buy it—and that time is put aside for them and they pay only $100.
>
> Mr. PASTORE. *The Senator is 100 miles off course.*
>
> Mr. STEVENS. Tell me where I am off course.
>
> Mr. PASTORE. That same time that the Senator is talking about is *prime time* for Proctor & Gamble for which they charge Proctor & Gamble $300, and they cannot charge the Senator $400.
>
> Mr. STEVENS. *That is not what the bill says.*
>
> Mr. PASTORE. Yes, it is.
>
> Mr. STEVENS. It has nothing to do with time, or frequency, or use. We took it up with the staff and the FCC. *If the Senator is willing to concede class of time I am ahead and I am willing to quit.*
>
> Mr. PASTORE. *I do not know where the Senator gets "class of time." I am talking about the same period of time.*
>
> . . . .
>
> Mr. STEVENS. There is double-, triple-, and third-class time; and that is prime time, middle time, and run-of-the-station time. It is in the FCC journals.

*Id.* (emphasis added). At this point, the Senators agreed that the bill approved by the committee would give candidates volume and frequency discounts. But only Senator Stevens thought the lowest unit charge provision would give politicians prime time at nonprime rates. As discussed in text, Senator Pastore did not think the provision would entitle candidates to one class of time at rates applicable to another "class." The Senators soon realized that they did not disagree about the proper outcome:

> Mr. PASTORE. This is the way the bill reads:
>
> During the 45 days preceding the date of a primary election and during the 60 days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same amount of time during the same period.
>
> Mr. President, you could change that and say "lowest unit charge of the station for the same amount and period of time."
>
> Mr. MILLER. The same amount and class of time?
>
> Mr. PASTORE. No, it is the period that counts, because in television it is the period that constitutes prime time. The Senator calls it class; I call it period. If class means so much the Senator can use "class." But we want to make sure we are talking about the same thing. Class is quality. Period is time.
>
> . . . .
>
> Mr. MILLER. I think the Senator from Rhode Island has recognized that we are talking about the same thing insofar as class of time is concerned, whether it is prime, triple A, or class D time. The language can be worked out on that.

*Id.*

**17.** During the debate, neither Senator referred directly to the Senate report. *See* 117 Cong. Rec. 29,025-29 (1971).

for the same period" (words added by amendment in italics).[18]

The debate clearly demonstrates that section 315(b)(1) gives a candidate purchasing a single spot the volume and frequency discounts available to bulk advertisers, and, despite language to the contrary in the Senate report, does not entitle the candidate to fixed prime time at preemptible or ROS rates. Although the Senators never explicitly stated that candidates' rights to ROS time on ROS terms would continue under the new provision, the committee report had noted that, under the original wording, such terms would have been available even for fixed prime time spots. And the Stevens amendment was only intended to ensure that candidates could not demand fixed prime time at ROS rates.

Taken together, the Senate report's explanation of the original wording and the debate on the Stevens amendment indicate that section 315(b)(1) entitles candidates to ROS time, but not fixed prime time, on ROS terms.[19] The lowest unit charge provision was intended to ensure that, during the pre-election period, candidates would receive not only the comparable rates available during other periods, but also volume and frequency discounts regardless of the number of announcements purchased.[20] In addition to being supported by the legislative history of the lowest unit charge provision, this construction is necessary to achieve the overall purposes Congress intended to serve by regulating rates for political announcements.

### B. The Purposes of Rate Regulation

Congress enacted provisions regulating rates charged candidates for media advertising on two occasions, once in 1952 and again in 1972. Each time, Congress had a specific goal in mind: in 1952 Congress wanted to end rate discrimination against political candidates, and in 1972 Congress attempted to reduce campaign costs by giving candidates volume and frequency discounts. The decision of the FCC in the instant case frustrates both purposes.

### 1. Rate Discrimination

Section 315(b)(1) entitles candidates to the "lowest unit charge of the station for the same class and amount of time during the same period." Because "class of time" is not defined in the statute, Alfa argues that it is free to define the term to include ROS time, with the result that candidates may be denied ROS rates: the statute only entitles candidates to the lowest unit rate associated with a proffered class, but does not entitle them to any particular class of time.

If broadcasters have total discretion to define "class of time," however, they will be free to return to pre-1952 rate discrimination simply by defining a "political" class of time, with higher rates than other classes, and then offering candidates only "political" time. When section 315(b)(1) was enacted in 1972, Congress was trying to improve the position of candidates by putting them on a par with broadcasters' most fa-

---

18. See Act § 315(b), 47 U.S.C. § 315(b) (1976), quoted in full in note 3 *supra*.

19. The only other explanations of the final version of § 315(b)(1) are two brief statements describing the conference provision, one in the conference report and the other made by Senator Pastore in presenting the conference version and the conference report in the Senate. Neither of these explanations provides any additional insight. See H.R.Rep.No.752, 92d Cong., 1st Sess. 22 (1971) (conference report); 117 Cong.Rec. 46,944 (1971) (remarks of Sen. Pastore).

The House bill had no provision analogous to § 315(b)(1), see H.R.Rep.No.564, 92d Cong., 1st

Sess. (1971), and at conference, the House agreed to the Senate version, see H.R.Rep.No. 752, 92d Cong., 1st Sess. 22 (1971).

20. The legislative history is replete with evidence supporting this proposition in addition to that discussed in text. For example, Senator Stevens' original amendment was regarded as equivalent to the comparable use provision. And the only difference between his original amendment and § 315(b)(1), as enacted, was an additional restriction in the former denying bulk rates to candidates who were not bulk advertisers. Compare Act § 315(b)(1), 47 U.S.C. § 315(b)(1) (1976), with 117 Cong.Rec. 29,025 (1971) (Stevens' original amendment). See also note 16 *supra*.

vored advertisers during the pre-election period; Congress certainly did not intend to do this by legalizing a return to pre-1952 rate discrimination.

More specifically, a station offering a candidate fixed position spots during a program period, but denying him ROS or preemptible terms, is engaged in rate, not class, discrimination. Stations differentiate between candidates and other advertisers regarding "length," "class," and "programming period" to protect legitimate programming interests that would be threatened if candidates could demand that their announcements run at certain times or for certain lengths of time. For example, a radio station might lose its entire "rush hour" audience if candidates could insist on two-hour advertisements during that period. See discussion of *Martin-Trigona v. WMAQ–TV*, 64 F.C.C.2d 1087 (1977), in text at notes 28–29 *infra*.

If a station is willing to offer a candidate a minute of time between 8:00 p. m. and 11:00 p. m., however, there can be only one legitimate reason for refusing to sell that minute on an ROS basis: the station does not give anyone ROS time during that period because the program schedule is fixed in advance and does not require the flexibility afforded by ROS spots. But if the station makes ROS terms available to other advertisers, no legitimate explanation justifies denying such terms to political advertisers. The station offers ROS terms and therefore must consider the flexibility of ROS valuable. It is willing to sell the candidate a one-minute spot between 8:00 p. m. and 11:00 p. m.; it does not object to running a political announcement of that length at that time. A station that insists on the sale of a fixed position spot under such circum-

stances is discriminating between candidates and other advertisers with regard to rate, not class or length of time.

### 2. Campaign Costs

In 1972, Congress was not concerned about the way spots were scheduled or the classes of time offered to candidates, but with the rates paid by politicians during media campaigns. Congress gave careful consideration to the amount spent on media advertising—and decided to lower that amount.[21] Allowing broadcasters to deny candidates ROS and preemptible terms by characterizing them as "classes of time" defeats this purpose.

Even if candidates are no longer entitled to ROS and preemptible terms during either the pre-election period or the non-election period, the result urged by Alfa, it is true that section 315(b)(1) may lower candidates' costs during the pre-election period to some extent because candidates will be able to purchase single spots at the rates available to bulk advertisers. But this benefit will be offset by loss of the right to ROS and preemptible terms previously available. And, during non-election periods, when section 315(b)(1) does not apply, candidates will not be entitled to either volume and frequency discounts or the ROS and preemptible rates previously offered. As a result, a candidate could end up paying more than any other advertiser making similar use of broadcast facilities. This outcome is clearly at odds with the purpose of the 1972 amendment to section 315(b)(1): to lower the amount spent on media advertising by giving candidates an *additional* discount during the pre-election period, while continuing to make comparable rates available during other periods.

---

**21.** *See, e.g.,* 117 Cong.Rec. 28,793 (1971) (Sen. Pastore includes in the record "a table showing the actual expenditures of senatorial candidates in 1970."); *Federal Election Campaign Act of 1971: Hearings on S. 1, S. 382, and S. 956 Before the Subcomm. on Communications* of the Senate Comm. on Commerce, 92d Cong., 1st Sess. app. A (1971) (318 pages of tables detailing actual costs of broadcast time in primary and general elections for state and federal officials).

## C. The Reenactment of the Comparable Use Provision

It is most unlikely Congress intended to affect candidates' rights to ROS and preemptible rates during the pre-election period at the time it enacted section 315(b)(1). Prior to 1972, under the FCC's decisions in *WHDH* and *Triangle*, discussed above, candidates were entitled to ROS time at ROS rates and preemptible time at preemptible rates. These rates were viewed as discounts, and candidates had a right to all discounts available to other advertisers on a comparable use basis. Against this background, Congress enacted section 315(b)(1) and, at the same time, reenacted as section 315(b)(2) the precise words of the comparable use provision previously interpreted by the FCC in *WHDH* and *Triangle*. Congress thus affirmed candidates' rights to ROS and preemptible rates during the non-election period.[22] And Congress would not have affirmed candidates' rights to ROS and preemptible terms during that period and simultaneously terminated such rights during the period in which candidates were to be treated on the same basis as a station's most favored advertisers. It turns legislative purpose on its head to attribute a result to Congress that is not only whimsical, but has an effect diametrically opposite to stated congressional concerns.

The intent of Congress—as gleaned from the legislative history of section 315(b)(1), the reasons for regulating rates charged political candidates, and the 1972 reenactment of the comparable use provision—can be given effect only if we adopt the interpretation of section 315(b)(1) advanced by Senator Hernstadt: ROS and preemptible rates are "lowest unit charges" and must be offered to candidates if they are available to others making similar use of broadcast facilities.[23]

This is indeed the interpretation adopted by the FCC at the time section 315(b)(1) was enacted. We turn to that initial interpretation and the reasons given by the FCC for changing its mind.

## IV. FCC INTERPRETATIONS OF SECTION 315(b)(1)

### A. The Initial Interpretation

From 1952 until the decision below, the FCC consistently interpreted the comparable use provision, now applicable only in non-election periods, as giving political candidates the right to all discounts, including ROS and preemptible terms, available to other advertisers making comparable use of the broadcast facility. Between 1972 and the decision below, the Commission considered ROS both a discount privilege and a class of time.[24] Candidates were not entitled to fixed time at ROS rates because section 315(b)(1) only entitled them to the lowest rate applicable to the class of time purchased. But broadcasters could not offer candidates only fixed time rates because ROS and preemptible rates were "lower unit charges."

As discussed above, this interpretation of the statute is supported by the legislative

---

22. Although no evidence in the legislative history conclusively demonstrates that Congress knew of *WHDH* and *Triangle* and meant to ratify these decisions in 1972, Congress is presumed to be cognizant of, and legislate against the background of, existing interpretations of law. *See, e.g., Helvering v. Griffiths*, 318 U.S. 371, 395–97, 63 S.Ct. 636, 648–49, 87 L.Ed. 843 (1943); *Wachovia Bank and Trust Co. v. National Student Marketing Corp.*, 650 F.2d 342 at 359 (D.C.Cir.1980); 2A D. Sands, Sutherland Statutory Construction § 45.12 (4th ed. 1973).

23. Candidates who choose ROS or preemptible terms are subject to all the risks associated with those terms; their spots may not run at all—or may run at an undesirable time.

24. *See Use of Broadcast and Cablecast Facilities by Candidates for Public Office*, 34 F.C. C.2d 510, 524 (1972) ("'class' refers to rate categories such as fixed-position spots, preemptible spots, run-of-schedule and special rate packages"); *id.* at 533 (The meaning of the "comparable use" provision is unchanged; "the 1970 primer contains Commission rulings on this statutory term .... These rulings are still valid.") (The 1970 primer described ROS rates as discount privileges. *See* note 10 *supra.*).

history. Moreover, as the contemporaneous interpretation of the agency charged with the statute's enforcement, it carries great weight. *See, e.g., Power Reactor Co. v. Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961); *Helvering v. Griffiths,* 318 U.S. 371, 395, 63 S.Ct. 636, 648, 87 L.Ed. 843 (1943); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *American Horse Protection Ass'n v. United States Department of Interior,* 551 F.2d 432, 440–41 (D.C.Cir.1977).

### B. *The Decision Below*

In the decision below, the FCC modified its interpretation of both the comparable use provision and the lowest unit charge provision in order to avoid a perceived inconsistency between these provisions and another section of the Act—that involving candidates' right of access to broadcast time. We begin our analysis of the decision below with a discussion of this right.

### 1. *The Right of Access to Broadcast Time*

Section 312(a)(7) of the Act, enacted in 1972, gives federal candidates, but not state or local candidates, a right of reasonable access to broadcast time.[25] However, section 315, which is applicable to all candidates, does not entitle a candidate to any broadcast time, but only to certain rates once time is offered.[26] Indeed, the words of section 315 suggest no other result. Both the original comparable use provision, now

applicable during non-election periods, and the 1972 lowest unit charge provision applicable during pre-election periods, only provide that candidates have a right to certain "charges" if time is sold to them.

In the initial decisions interpreting the original comparable use provision, *WHDH* and *Triangle,* the FCC held that candidates were entitled to certain rates once time was offered, but did not suggest that the statute gave any right of access to broadcast time. Moreover, in its 1970 primer on the use of broadcast facilities, the Commission noted that the comparable use provision entitled candidates to ROS and preemptible rates, *see Use of Broadcast Facilities by Candidates for Public Office,* 24 F.C.C.2d 832, 880–82 (1970), but also observed that "[n]either the Act nor the Commission's rules contain any provisions which require a licensee to sell a specific time segment to a candidate for public office." *Id.* at 866. Unfortunately, the Commission did not adhere to that position.

In 1974, two years after Congress enacted section 312 and granted only federal candidates reasonable access to broadcast time, the Commission first suggested that the right to a station's "lowest unit charge" during pre-election periods under section 315(b)(1) might include a right of access to certain broadcast time:

> [W]here licensees sell spot announcements to legally qualified candidates for public office, it would be contrary to the

---

**25.** *See* Act § 312, 47 U.S.C. § 312 (1976):

    (a) The Commission may revoke any station license or construction permit—

    .    .    .    .    .

    (7) for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.

**26.** Section 315(b) does not give candidates a right to anything other than an appropriate nondiscriminatory rate. A station need not offer a candidate ROS time during any particular

time of day, even though the ROS terms available to other advertisers include that period— provided, of course, that the difference between what is offered the candidate and what is available to other advertisers does not evidence a discriminatory rate structure rather than bona fide programming and scheduling policies.

    Although § 312 gives federal candidates a right of reasonable access to program time, it does not give Senator Hernstadt, a candidate for local office, any right of access to broadcast time. We need not, therefore, consider the extent to which a station can restrict a *federal* candidate's access to broadcast time without violating § 312.

Congressional objective of putting candidates in the same position as the most favored commercial advertisers to deny to such candidates the opportunity to purchase spot announcements of the type and length which are available to commercial advertisers.[27]

This right of access was not absolute; a station could refuse to sell a candidate any time. But once time was offered, the station was obligated to offer the candidate the types and lengths of time available to the station's most favored advertisers.

*Campaign '76 Media Communications, Inc. v. WGN Continental Broadcasting Co.,* 58 F.C.C.2d 1142 (1976), was the first case applying this new rule. WGN refused to sell political announcements less than five minutes in length during the pre-election period. The station explained that this policy "was adopted in good faith in order to provide voters with information necessary for the responsible exercise of their franchise." *Id.* at 1143. WGN also noted that a five-minute program cost only about fifteen percent more than a one-minute spot, and was actually cheaper than a one-minute spot during certain periods of the day. *Id.*

This argument fell on deaf ears. The Commission held that WGN's refusal to sell spots shorter than five minutes was "contrary to Congress' intent to 'place the candidate on a par with a broadcast station's most favored commercial advertiser.'" *Id.* at 1144. The Commission went on to note that *WHDH* and *Triangle* supported the proposition that candidates were entitled to "spots . . . available to commercial advertisers." *Id.* at 1144–45 (footnote citing *WHDH* and *Triangle* omitted). Under *WGN,* candidates for local office continued to have no absolute right of access to broadcast time: the station was not required to

offer any time to such a candidate. But once it did so, the FCC insisted that, under section 315, it had to offer the lengths of time available to its most favored advertisers.

The Commission realized that *WGN*'s extension of section 315 to include a right of access to broadcast time was wrong when it faced a candidate who wanted to buy hour and half-hour slots of time. The demand was made by Anthony Martin-Trigona, a candidate for local office, in *Martin-Trigona v. WMAQ–TV,* 64 F.C.C.2d 1087 (1977). The problems on a policy level were obvious. Upholding such a demand might well cause a decrease in broadcast time available to candidates for local office. Under *WGN,* such candidates for local office continued to have no absolute right of access to time. And stations would be reluctant to offer any time to local candidates if doing so would result in long political announcements and the consequent loss of listeners. In any event, the forced sale of time for lengthy political diatribes would not advance the public interest.

The Commission rejected Martin-Trigona's demand for hour and half-hour slots, overruled *WGN,* and held that candidates were not entitled to program time of any particular length under either the comparable use provision or the lowest unit charge provision. This decision examined the relevant legislative history, and concluded that the parity Congress desired to achieve between candidates and other advertisers was a parity of price, but not "a right of access to all types [of time] available to other advertisers." *Id.* at 1090.[28]

The holding of *Martin-Trigona* is in accord with pre-1972 interpretations of section 315.[29] Although the Commission had

---

**27.** *In Re Public Notice Concerning Licensee Responsibility Under Amendments to the Communications Act Made by the Federal Election Campaign Act of 1971,* 47 F.C.C.2d 516, 518 (1974).

**28.** *See also Moity v. KALB–TV,* 46 Rad.Reg. (P&F) 399 (B/c Bur. 1979), *review denied,* FCC

No. 80–438 (July 23, 1980) (a candidate for local office has no right to half-hour program time).

**29.** *WHDH* and *Triangle* were decided prior to the enactment of § 312(a)(7) in 1972. These cases therefore dealt with rates charged candidates under § 315 at a time when neither state

relied on *WHDH* and *Triangle* to support the *WGN* decision, it had done so erroneously, and those two cases do not collide with the FCC's decision in *Martin-Trigona*: section 315 gives candidates no right of access to broadcast time, but once access is provided, the time must be offered at the discount rates available to comparable users, including ROS and preemptible rates. Unfortunately, in its decision in the present case, the Commission read *Martin-Trigona* as requiring yet another change in the interpretation of section 315.

2. *The Right to ROS and Preemptible Spots*

In the decision below, the Commission held that candidates were not entitled to ROS or preemptible rates because these are classes of time and not discounts. The Commission began by citing *Martin-Trigona*. "The Commission mandate in *Martin-Trigona* is clear: Licensee are *not* required to sell nonfederal candidates every *class* of time. As explained below, we believe that ROS and preemptible spots should be considered classes of time rather than discount privileges." *Hernstadt v. Alfa Broadcasting Co.*, FCC No. 80–574, slip op. at 6 (Oct. 3, 1980) (emphasis in original). The Commission explained that ROS and preemptible spots were classes of time and not discount privileges because of their "unique preemptibility and scheduling attributes. The rates for ROS and preemptible spots are lower than fixed spots, since it is the *nature* of such spots which is determinative of their low costs." *Id.* (emphasis in original).

Prior to this decision, as noted above, the Commission had consistently held that ROS and preemptible spots were both classes of time *and* discount privileges. Because of their "unique preemptibility and scheduling attributes," they were classes of time—and the associated rates were not, therefore,

available for the purchase of fixed time. But because these terms were cheaper than other terms, they were also discounts. We see nothing in their "nature" mandating a different result.

The FCC gave only one additional reason for its decision that the lowest unit charge provision did not entitle candidates to ROS and preemptible rates. Because Congress had explicitly provided for "cheap" rates in 1972, it was no longer necessary for the Commission to worry about the costs of political advertising:

> In 1967, the Commission was understandably concerned about ensuring candidates the opportunity to purchase "low cost spots." However, in 1972, Congress established the lowest unit charge provision, thereby eliminating much of the Commission's concerns. With the amendment to Section 315, it is no longer necessary to define ROS and preemptible spots in terms of discount privileges; henceforth, they will be recognized as classes of time.

*Hernstadt*, slip op. at 6.

We do not understand this approach to statutory construction. Congress was concerned about rates in 1952 and enacted the comparable use provision. The FCC's initial interpretation of this section reflected that interest. In 1972, Congress was still concerned about rates and enacted a provision granting candidates even lower rates during the pre-election period. After this amendment, the FCC should have been more, not less, heedful of rates.

Finally, the Commission went on in *Hernstadt* to change its interpretation of the comparable rates provision, overruling *WHDH* and *Triangle*. The Commission reasoned that this result was necessary because otherwise candidates would be better off during non-election periods than during

---

nor federal candidates had a statutory right of access to broadcast facilities. Today, § 312(a)(7) only provides a right of reasonable access for federal candidates; candidates for

state and local office, such as Anthony Martin-Trigona and Senator Hernstadt, continue to be entitled only to certain rates under § 315.

pre-election periods: if ROS and preemptible rates were not available during the most-favored-advertiser (pre-election) periods, they should not be available during other periods.

It is true that if ROS and preemptible rates are not available during the pre-election period, it would be anomalous to find them available at other times.[30] As a result of the Commission's actions, however, the 1972 amendment accomplishes the opposite of what Congress intended. Congress wanted to decrease rates because campaign costs were too high. This was to be done by making rates even lower during the period immediately before the election than they were at other times. If *WHDH* and *Triangle* are overruled, rates will be lower during the pre-election period than at other times—but only because they will be *higher* during non-election periods than they were before the 1972 amendment. What Congress sought to reduce, the Commission increases, and blames the increase on Congress.

Obviously, the Commission is entitled to deference when reviewing its prior decisions and declarations of policy in order to fulfill the mandates of Congress. *See, e.g., Automobile Club v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *Chisholm v. FCC*, 538 F.2d 349, 364 (D.C. Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). But, as this court has noted in the past,

> the Supreme Court has established that an agency's entitlement to deference depends upon the quality of its determinations. Factors to be considered include " 'the thoroughness evident in its consideration, the validity of its reasoning,

[and] its consistency with earlier and later pronouncements.' "[31]

In its decision below, the FCC overruled a long-standing interpretation of section 315 in order to correct a perceived inconsistency between that interpretation—entitling candidates to ROS rates—and recent FCC decisions holding that section 315 did not entitle candidates to specific lengths of time. Although the FCC attempted a reasoned resolution of this conflict in the decision below, we do not defer to it for several reasons. First, the purported conflict disappears upon close analysis, and, as discussed above, the FCC's other reasons for denying ROS rates to political candidates fail to support the new interpretation. Second, the FCC made its decision without reference to legislative history and without realizing that the outcome thwarts the intent of Congress in enacting the 1972 amendments. Under such circumstances, we adopt the construction mandated by consideration of the legislative history and congressional intent rather than defer to the interpretation of the Commission.

## CONCLUSION

The FCC has overruled a long line of decisions, rules, and guidelines to hold that candidates are not entitled to ROS and preemptible rates under either the lowest unit rate provision, section 315(b)(1), or the comparable use provision, section 315(b)(2). This about-face is inconsistent with the legislative history of section 315(b)(1) and the overall purposes of rate regulation. Congress enacted the lowest unit charge provision to give candidates even lower rates during pre-election periods than they had previously enjoyed. More specifically, the Senate report and the debate on the Ste-

---

**30.** It was because the Commission perceived this anomaly that it felt constrained to decide in *Hernstadt* whether candidates are entitled to ROS and preemptible terms during non-election periods—even though the issue was not before the Commission, and eliminating the anomaly made it necessary to overrule two earlier decisions.

**31.** *Democratic Senatorial Campaign Comm. v. FEC*, 660 F.2d 773 at 776–777 (D.C.Cir.1980) (quoting *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 573 n.5, 54 L.Ed.2d 538 (1978) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944))) (footnote omitted).

vens amendment, taken together, indicate that ROS and preemptible rates should be offered to candidates throughout the year, though such rates should not be available for the purchase of fixed time even during pre-election periods.

We hold that the lowest unit charge provision entitles candidates to ROS and preemptible terms when those terms are offered to others making similar use of broadcast facilities. A candidate who chooses such terms is, of course, subject to all the risks associated with the "unique preemptibility and scheduling attributes" of such spots.

*Reversed and remanded.*