709 F.2d 922
 9 Media L. Rep. 2334
 KVUE, INC., Plaintiff-Appellant,
and
AUSTIN BROADCASTING CORP. and Central Texas Broadcasting
Co., Inc., Intervenors-Appellants,
v.
Margaret MOORE, In Her Official Capacity as County Attorney
for Travis County, Texas, Defendant-Appellee,
and
The State of Texas, Intervenor-Appellee.
 No. 82-1192.
 United States Court of Appeals,
Fifth Circuit.
 July 18, 1983.
 
 R. James George, Jr., David H. Donaldson, Jr., Austin, Tex., for plaintiff-appellant.
 Erwin G. Krasnow, Washington, D.C., amicus curiae for Nat. Ass'n of Broadcasters.
 James W. Collins, James Rader, Asst. County Attys., Austin, Tex., for Moore.
 Margaret S. McGloin, Asst. Atty. Gen., for the State of Tex.
 Appeal from the United States District Court for the Western District of Texas.
 Before RUBIN, GARZA, and WILLIAMS, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 A television broadcaster challenges the constitutionality of a Texas statute prescribing the rates radio and television stations may charge political advertisers and requiring sponsors of such advertising to identify themselves. The district court found that the broadcaster had not been threatened with prosecution and dismissed the complaint for lack of standing to challenge the statute. We conclude that the broadcaster has suffered injury as a result of enactment of the statute and, therefore, presents us with a justiciable controversy.
 
 
 2
 On the merits, we conclude that the portion of the Texas statute setting the rates that may be charged for political advertising is unconstitutional because it conflicts directly with federal law and is, therefore, preempted. We conclude, however, that the sponsorship identification requirement is valid to the extent it applies to candidates for nonfederal office and campaigns that do not involve federal issues.
 
 I.
 
 3
 Article 14.09(B) of the Texas Election Code prohibits a radio or television station from charging a rate for political advertising that exceeds the lowest unit charge made by the station to other advertisers "for the same class, condition and amount of time."[1] This statute applies both to advertising in support of and in opposition to a particular candidate (candidate advertising) and to broadcasts for or against political issues (issue advertising). Article 14.09(A) prohibits the broadcast of either candidate or issue advertising that does not disclose the name and address either of the agent who contracted for the broadcast or of the person represented.[2] Violation of each section is a crime, punishable by sanction fixed by the statute.[3]
 
 
 4
 KVUE-TV, Inc. (KVUE) sued the county attorney for Travis County seeking a declaratory judgment that both provisions violate the United States Constitution and an injunction preventing enforcement of the statutes. It asserted that both portions of the statute abridge its right to freedom of expression, safeguarded by the first amendment, expanded by the fourteenth to protect against state action, and that, because there is federal legislation concerning the same subject, the statute violates the supremacy clause of the Constitution. The State of Texas intervened to support Ms. Moore's position, arguing first that KVUE has not been injured and, therefore, lacks standing to challenge the statute; second, that if KVUE has standing, the federal courts should abstain until the statute is interpreted by a Texas court; and, finally, that the law is constitutional. We discuss these issues in turn.
 
 II.
 
 5
 Article III of the Constitution imposes limits on the cases federal courts may hear. This includes the requirement, broadly described as the justiciability doctrine, that there be a "case or controversy." The very use of the terms "case or controversy" implies that the dispute must be real, not hypothetical, and that the plaintiff must be personally affected and thus have standing to sue.
 
 
 6
 Almost two centuries ago, the Supreme Court declined on this basis to give advice to President George Washington, whose request was transmitted by Thomas Jefferson, because no actual controversy was involved and the President sought only guidance.[4] The case or controversy requirement also forecloses our consideration of moot cases,[5] of abstract, hypothetical, and conjectural questions,[6] and, indeed, of all matters save those involving parties who have a real dispute about a matter in which their interests are genuinely adverse. We consider whether KVUE's case meets these requirements.
 
 A. Case or Controversy
 
 7
 The basic inquiry in determining whether a case or controversy exists is whether the "conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract."[7] Thus the requirement focuses on the issues in the case rather than on the party seeking to present them. The difference between a case or controversy and an abstract question is, however, one of degree and "is not discernable by any precise test."[8] It depends on, among other factors, the imminence of the harm, the adversariness of the parties' positions, and the reality of injury to the plaintiff.
 
 B. Standing
 
 8
 The rule that parties seeking relief in federal court must have standing to sue is closely related to the case or controversy requirement. It focuses on whether the plaintiff before the court is a proper party to sue rather than on the issues in the case. We determine whether a party has standing to sue by ascertaining whether it has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of [the] issues ...."[9] A plaintiff may establish standing to sue in federal court by demonstrating that his federal rights are jeopardized by the action of a state. However, "persons having no fears of state prosecution except those that are imaginary or speculative ...." lack standing.[10] A litigant may not, therefore, challenge the constitutionality of a state criminal statute merely because he desires to wipe it off the books or even because he may some day wish to act in a fashion that violates it.[11]
 
 
 9
 To invoke a federal trial court's jurisdiction, a litigant "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."[12] But "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights."[13]
 
 
 10
 On the other hand, one who has violated a state law and has been charged with that offense will not be allowed to file suit in a federal court to challenge the constitutionality of the statute if the state permits him to raise the constitutional issue in the proceeding pending in its court.[14] A federal decision at that juncture would interfere with the state's criminal process. Thus, one who seeks to challenge a state statute as violative of the federal constitution may not sue before he is truly injured; yet he may not wait until he is charged with a crime. He may invoke federal jurisdiction only if he can move through the narrow door between prematurity and exclusive state jurisdiction.
 
 C. KVUE's Position
 
 11
 Our inquiry cannot always turn on either the "standing" or the "case or controversy" requirement alone. The concepts are sometimes so interrelated that the determination can be made only by considering both. For example, in Younger, the Court held that three of the four plaintiffs, who had never been arrested, indicted, or even threatened with prosecution, lacked standing to sue because their complaint alleged only that they felt "inhibited" in their desire to distribute handbills by the statute they challenged. This fear, the Court held, was "imaginary or speculative." 401 U.S. at 42, 91 S.Ct. at 749, 27 L.Ed.2d at 674. As to them the Court focused attention on the standing aspect of justiciability, not on the existence of a controversy. The fourth plaintiff, who was actually being prosecuted in state court, had an obvious "controversy" with the state, id. at 41, 91 S.Ct. at 749, 27 L.Ed.2d at 673,[15] but was required nonetheless to present his constitutional argument in the criminal proceeding in state court.
 
 
 12
 In Steffel, however, the Court found an actual controversy because the plaintiff had been twice warned to stop distributing handbills and had been told that, if he continued to pass out the leaflets, he would likely be prosecuted. In addition, his handbilling companion had been prosecuted. The Court stated that this evidence was "ample demonstration that petitioner's concern with arrest has not been 'chimerical.' In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." 415 U.S. at 459, 94 S.Ct. at 1215-16, 39 L.Ed.2d at 514 (citation omitted). It was not necessary for the plaintiff to allege or demonstrate irreparable injury.[16]
 
 
 13
 In Babbitt, the Court considered a challenge to several provisions of a statute affecting the plaintiffs' conduct. The Court posed two situations: first, a case in which the plaintiff "allege[s] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [in which] there exists a credible threat of prosecution ...."; second, a case in which plaintiffs " 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible ....' "[17] In the former instance, the Court stated, the plaintiff need not wait for the state to initiate criminal proceedings in order to secure relief; in the latter, the plaintiffs "do not allege a dispute susceptible to resolution by a federal court." 442 U.S. at 299, 99 S.Ct. at 2309, 60 L.Ed.2d at 906-907.[18]
 
 
 14
 KVUE charged the advertising rates required by the statute until October 1981, losing some $2,300 in revenue in 1980 and $2,100 in 1981. It filed suit on October 29, 1981, and obtained a temporary restraining order preventing enforcement of the statute. Until November 17, 1981, when the restraining order was vacated, it charged rates greater than Sec. 14.09(B) permits, and, during this period at least, suffered no loss of revenue as a result of the statute.
 
 
 15
 The state and county assert that KVUE also lacks standing because it has no real basis for apprehending that it will be prosecuted for charging rates in excess of those permitted by the statute. County Attorney Margaret Moore testified that she had not threatened KVUE with prosecution because she had not received a complaint, but had only advised people what information she would require before undertaking a prosecution. She stated that she did not anticipate prosecuting KVUE but would not issue "advisory opinions" about the likelihood of a prosecution without having a "set of facts" before her. She referred to the ambiguous language of Article 14.09(B), which might conceivably authorize the political advertising rates presently charged by KVUE and stated:
 
 
 16
 This statute ... has some problems in it, ... and I'll be honest with you, I would be hard pressed to prosecute anyone under that statute without some sort of clarification as to a number of different items. In other words, there are a number of problems in there for a prosecutor if you are really going to talk about putting a case together, so it's safer for me to say I'm not going to prosecute anyone than it is to say I am given the situation at this time.
 
 
 17
 The Attorney General of Texas has since released a formal opinion clarifying the statute. See Op.Tex.Att'y Gen. MW-488 (July 7, 1982). We take judicial notice of this opinion and consider the effect, if any, of the Attorney General's opinion on KVUE's standing without remanding the case for the district court's views.[19]
 
 
 18
 The district judge concluded that the County Attorney's testimony "would clearly allay any reasonable fear of prosecution." We do not find the testimony so reassuring even without the clarification provided by the Attorney General's opinion.
 
 
 19
 The threat to KVUE looms between the chimerical apprehension that the Younger Court labeled too unreal to warrant litigation and the fear that the Steffel Court treated as sufficiently real to warrant judicial consideration. The station alleges that it desires to violate the statute and has demonstrated that the county attorney, pursuant to her statutory duty to enforce the law and despite her concerns about the statute's possible ambiguity, would not rule out prosecution. The county attorney's concerns about the statute's ambiguity should indeed have been allayed by the Attorney General's opinion, creating the likelihood that this would no longer be a deterrent. Furthermore, the possibility that an advertiser may file a complaint with the county attorney is not entirely supposititious. Several advertisers filed written protests with KVUE when it did not charge the lowest unit rate and another inquired of the county attorney's office what might be done, testifying that he would at least consider filing a complaint to settle the question.
 
 
 20
 In addition, KVUE offered evidence that it suffered actual monetary losses during the time it obeyed the law and that it has in fact violated the statute since vacation of the restraining order. The combination of these facts persuades us that KVUE has standing to sue and has presented us with a live controversy between adverse parties.
 
 
 21
 The threat is more immediate than that held insufficient to confer standing in City of Los Angeles v. Lyons, --- U.S. ----, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In Lyons, the Supreme Court held that a person who had been once subjected to an allegedly illegal chokehold lacked standing to seek an injunction barring the future use of such chokeholds. The Court stated: "That [the plaintiff] may have been illegally choked by the police on October 6, 1976 ... does nothing to establish a real and immediate threat that he [will] again be stopped ... by an officer ... who [will] illegally choke him into unconsciousness without any provocation or resistance on his part." Id. at ----, 103 S.Ct. at 1667, 75 L.Ed.2d at 686.
 
 
 22
 KVUE has suffered actual financial loss as a result of the enforcement of the statutes. Should we refrain from deciding the case, KVUE will have to comply with the law and suffer a loss of revenue or defy it and face the likelihood of prosecution. Therefore, this case is not controlled by Lyons; it is more like Kolender v. Lawson, --- U.S. ----, ---- n. 3, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903, 908 n. 3 (1983), in which the Court held that a plaintiff stopped by police 15 times in two years had standing because of the existence of a "credible threat" that he might again be detained.[20]
 
 
 23
 That the statute has not been enforced and that there is no certainty that it will be does not establish the lack of a case or controversy. The state has not disavowed enforcement. As the Court stated in Babbitt:
 
 
 24
 [W]hen fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." The ... criminal penalty provision applies in terms to "[a]ny person ... who violates any provision" of the Act. Moreover, the State has not disavowed any intention of invoking the criminal penalty provision against [the plaintiffs]. Appellees are thus not without some reason in fearing prosecution .... In our view, the positions of the parties are sufficiently adverse with respect to the ... provision ... to present a case or controversy within the jurisdiction of the District Court.
 
 
 25
 442 U.S. at 302, 99 S.Ct. at 2310-11, 60 L.Ed.2d at 909 (citations and footnote omitted).
 
 III.
 
 26
 The existence of a "case" in the constitutional sense being established, we consider its merits. Article 14.09(B) requires broadcasters to charge the "lowest unit charge ... for the same class, condition and amount of time for the same period."[21] Texas contends, plausibly indeed, that on its face the statute may be read to require the charge to be the lowest rate charged any advertiser, thus entitling political advertisers to bulk rates, or it may be read more narrowly, limiting the charge levied on political advertisers to the rate quoted regular commercial advertisers who buy in the same quantity as the political advertisers. The state, therefore, contends that we should abstain from deciding the constitutional question until the Texas courts construe the statute.[22]
 
 
 27
 This argument fails without regard to whether the statute is ambiguous because it may be equally unconstitutional under either interpretation. The vice challenged here is Texas' regulation of political advertising rates, not the specific rate fixed. If the state may not constitutionally regulate the rate to be charged, neither interpretation will save the statute. We employ Pullman abstention only when the state court's determination "will eliminate or substantially modify a federal constitutional question."[23] Here, the question is whether, regardless which construction of the statute the state may adopt, the federal statute and regulations prevent Texas from legislating in this field.
 
 IV.
 
 28
 The United States Constitution gives primacy to laws enacted by the Congress as the "supreme law of the land." U.S. Const. art. VI, Sec. 2. This supremacy is patent when a state law conflicts directly with a federal law.[24] In that event the state law is invalid. Even when a state law does not conflict with a federal law, it is invalid if Congress has preempted the area the state law seeks to regulate. Congress may do this in two ways: it may express its intent to oust state legislation, or it may regulate a subject so pervasively that it occupies the field, leaving no room for state action.[25] If preempted, a complementary or supplementary state regulation is as invalid as one directly conflicting with the federal scheme, for preemption forbids state regulation either to advance or to retard the federal purpose.[26] Unless preemption is express, the test of preemption is whether (1) the area requires national uniformity,[27] (2) there is evidence of congressional design to preempt the field,[28] or (3) the state statute actually and directly conflicts with the federal. Because the federal statutes do not expressly forbid state regulation, we review the regulatory scheme to determine whether it preempts state legislation in any other fashion.
 
 A. Federal Regulation of Advertising
 
 29
 Federal regulation of broadcasting, whether by radio or television, is comprehensive. By the Communications Act's licensing provision federal law governs who may broadcast and over what frequencies. Under that statute and the regulations adopted pursuant to it, broadcast licenses may be issued only after the Federal Communications Commission (FCC) determines that issuance is in the public interest.[29] Licensees' broadcasting discretion is subject to a number of important limits such as the personal attack rule,[30] the fairness doctrine,[31] the prime-time access rule,[32] and the equal opportunity rule.[33] Federal regulations also govern billing for media advertising,[34] refusal to sell advertising time,[35] sponsorship information,[36] alcoholic beverage advertising,[37] amounts of commercial time,[38] penalties for false, misleading, or deceptive advertising,[39] loudness of commercials,[40] and the number of commercials permitted during a given program.[41]
 
 
 30
 This comprehensive regulatory scheme does not, however, entirely bar states from legislating in the broadcast field. Thus in Head v. New Mexico Board of Examiners, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963), the Supreme Court upheld the constitutionality of a state statute forbidding price advertising by optometrists. Recognizing the comprehensive nature of federal regulation under the Communications Act, the Court nevertheless held that preemption questions in the communications field must be answered by considering the specific factors in each case. The Court noted: "[s]tatements concerning the 'exclusive jurisdiction' of Congress beg the only controversial question: whether Congress intended to make its jurisdiction exclusive." Id. at 430, 83 S.Ct. at 1763, 10 L.Ed.2d at 988. The Court held that the state statute was not preempted because Congress "could not have intended its grant of authority to supplant all the detailed state regulation of professional advertising practices ...." Id. at 431, 83 S.Ct. at 1764, 10 L.Ed.2d at 989. We must, therefore, inquire whether Congress intended its regulation of and grant of authority to the FCC over political advertising to oust state regulation.
 
 
 31
 B. Federal Regulation of Political Advertising
 
 
 32
 Congress has enacted legislation regulating both the permissible price for candidate advertising and the required identification of sponsors of political broadcasting. The Federal Election Campaign Act of 1971 amended the Communications Act to provide that broadcasters must sell political candidates time at "the lowest unit charge of the station for the same class and amount of time for the same period ..." during the 45 days before a primary election and 60 days before a general election.[42] At all other times the broadcasters must sell time at charges made for comparable use of the time by nonpolitical advertisers.[43] Congress authorized the FCC to promulgate regulations implementing the statute, which the FCC has done.[44]
 
 C. Sponsorship Identification
 
 33
 The statute neither regulates all types of political advertising nor manifests any intention to occupy the political advertising field. Nor does the legislative history suggest that Congress intended entirely to preclude state regulation of political advertising. The FCC has, however, apparently expressed the view that the sponsorship requirements preempt state law in part.[45] In a joint statement, the Commission and the Federal Election Commission have informed broadcast licensees how to comply with the sponsorship identification requirement. After listing a number of approved sponsorship announcements, the two commissions stated: "The notice requirements of the FECA and the FEC Rules supersede and preempt any state statute which attempts to impose additional notices on political advertising by Federal candidates or committees."[46]
 
 
 34
 The FEC and FCC requirements are not identical. The FEC rules apply to candidates, their committees, and others buying political broadcast time. The announcements required are designed to reveal whether a commercial is authorized by a candidate.[47] The FCC rules apply to broadcast licensees. They are designed to satisfy Sec. 317 of the Communications Act, which "states that when a station is paid to broadcast anything, [it] must announce that the broadcast is paid for and who paid for it."[48]
 
 
 35
 Although the expression of intent to preempt does not expressly apply to the FCC's identification-of-sponsorship rules, it appears in a statement coauthored by the FCC and listing sponsorship identifications complying with Sec. 317 and the regulations. The statement expresses federal intent to preempt the imposition by states of additional notice requirements on political advertising by federal candidates. Thus, it is sufficient to invalidate the Texas statute to the extent that the law seeks to regulate federal candidates or committees.[49]
 
 
 36
 Patently the FCC does not seek to control sponsorship identification by state candidates or committees. The Texas sponsorship requirement is, therefore, valid to the extent that it regulates such advertising concerning state elections and campaigns. There is no direct conflict between the federal sponsorship requirements and Texas' requirement. It is not physically impossible to comply with both laws; indeed, compliance with the Texas statute satisfies the federal requirement.[50] Nor does the Texas statute obstruct the federal purpose. The federal statute is meant to require identification of sponsors in a way that viewers can comprehend.[51] The Texas statute furthers rather than obstructs Congress' goal.
 
 
 37
 When "the federal requirements [do] not regulate every aspect of [the] area, the state ha[s] the implied reservation of power to fill out the scheme."[52] State regulation is preempted only if the federal rules occupy the entire field or directly conflict with, hence denying, state authority. Texas may, under the circumstances, add a requirement to the federal pattern.
 
 D. Rate Regulation
 
 38
 By contrast, neither Congress nor the FCC has taken the position that the advertising rate provisions of Sec. 315 oust states from regulating the price stations may charge for broadcasting political advertising. The federal statute requires that broadcasters charge the lowest unit rate 45 days before the primary and 60 days before the general election. 47 U.S.C. Sec. 315(b)(1). A comparable use rate applies for the remainder of the year. 47 U.S.C. Sec. 315(b)(2).[53] The FCC has stated that the federal statute "of course applies to all legally qualified candidates for public office, and not merely Federal candidates."[54] The statutory language supports that interpretation and we find it persuasive.[55]
 
 
 39
 Before Congress amended Sec. 315 the statute simply provided that candidates were entitled to comparable rates at all times. The 1971 amendments added Sec. 315(b)(1), requiring broadcast licensees to offer political advertisers the lowest unit rate within a 45-day "window" of the primary and a 60-day "window" of the general election. Congress' overriding purpose in adding Sec. 315(b)(1) was to put political advertisers on par with ordinary commercial advertisers. Candidates are, therefore, "entitled to discounts, frequency and otherwise, offered to a station's most favored commercial advertiser for the same class and amount of time for the same period, without regard to frequency of use by the candidate."[56] Thus, for example, a candidate is entitled to a rate based on a "package" or "plan" published on the station's rate card even if, during the relevant "window" period, no commercial advertiser purchased the "package."[57]
 
 
 40
 Congress sought to place candidates on equal footing with a station's most favored commercial advertisers. Because "a political candidate's broadcast requirements are limited in terms of weeks or a few months at best ... he cannot avail himself of the favorable rates available to commercial advertisers who usually buy time in bulk for longer periods."[58] The FCC has recognized that the addition of Sec. 315(b)(1) had a two-fold purpose: to give political candidates access to the broadcast media to explain their stand on issues and to limit the cost of campaigning for public office.[59] Congress' expression of the latter purpose makes clear its determination that candidate access to the media at extremely low cost should be permitted only during a limited "window" period. It stated: "The Committee is also persuaded that a limitation on the length of time when this most favored rate is available will be an incentive to candidates to shorten the duration of their campaigns, thereby helping to reduce campaign costs. Accordingly, the legislation provides that the lowest unit rate will only be available forty-five days before a primary election and sixty days before a general or special election."[60] Indeed the House-Senate Conference Committee rejected a proposal that would have required broadcasters to offer candidates a year-round rate equal to the "actual charges ... for any comparable use of [the] station for other purposes."[61] The FCC has applied this policy and expressed extreme reluctance to broaden the meaning of "primary election" because of the consequent burden on broadcasters.[62]
 
 
 41
 In short, although Congress intended to allow access to the media at low rates, it carefully circumscribed the time during which those rates are available. The FCC has likewise moved with caution in applying the statute to the diverse sorts of political gatherings that take place in our 50 states. Furthermore, Congress and the FCC have limited the scope of the provisions to require broadcasters to charge the lowest unit rate to candidates and their campaign committees only.[63]
 
 
 42
 The Texas statute sweeps far more broadly. Article 14.09(B) provides that for all political advertising--both candidate and issue advertising--a broadcaster can never charge more than "the lowest unit charge of the station for the same class, condition and amount of time for the same period." It permits access by candidates and their committees, but also allows noncandidates and unaffiliated committees to take advantage of the extremely low advertising rate. It extends the low rate from a period of days to the entire year. This extension of the statute's coverage to noncandidates and of the lowest unit charge to a year-round rule stands as an obstacle to the achievement of Congress' purpose in enacting the rate regulation statute.
 
 
 43
 Thus the Texas statute conflicts directly with the federal statute in important ways. It lengthens, rather than shortens, the "campaign season." It encourages greater, rather than lesser, campaign spending by encouraging candidates--and others--to advertise year-round. It imposes a considerably heavier burden on broadcasters to make low-cost time available to political advertisers than does the federal statute.[64] Finally, it may have the effect of limiting rather than increasing candidate access to the media by discouraging stations from making advertising time available to nonfederal candidates at all.[65]
 
 
 44
 KVUE also asserts that the sponsorship identification requirement violates the first amendment because it requires that certain statements be made with political speech, thus stripping the broadcaster of some measure of absolute editorial control. KVUE characterizes the sponsorship identification requirements as exacting a promise that certain words will be said as the price of political broadcasting and, therefore, as penalizing speech based on its political content.
 
 
 45
 The Supreme Court has recognized that preservation of the integrity of the electoral process is a compelling state interest.[66] As the Court stated in Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714, 723 (1974), "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Texas' sponsorship requirements are "generally-applicable and evenhanded regulations that protect the integrity and reliability of the electoral process itself."[67] They do not regulate the content of the political message. Even assuming arguendo that the Texas sponsorship identification requirement infringes on KVUE's first amendment rights, the infringement is of an extremely limited nature because it merely adds the words "paid political announcement" and the sponsor's address to the federal requirement, the constitutionality of which KVUE does not challenge. By contrast the state interest is compelling. Accordingly, under the balancing test of Anderson, --- U.S. at ----, 103 S.Ct. at 1570, 75 L.Ed.2d at 557, the Texas requirement does not violate the first amendment.
 
 
 46
 For these reasons, the judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.
 
 
 
 [1]
 Tex.Elec.Code Ann. art 14.09(B) (Vernon Supp.1982) provides:
 (B) Any advertising medium or any officer or agent thereof who willfully demands or receives for any political advertising any money or other thing of value in excess of the sum due for such service, or any person who pays or offers to pay for such service any money or other thing of value in excess of the sum due, or any person who pays or offers to pay any money or other thing of value for the publication or broadcasting of political advertising except as advertising or production matter, shall be fined not more than $100. No advertising medium may charge a rate for political advertising in excess of the following:
 (1) For advertising broadcast over a radio or television station, including a community antenna or cable television system, the rate charged shall not exceed the lowest unit charge of the station for the same class, condition and amount of time for the same period.
 
 
 [2]
 Tex.Elec.Code Ann. art. 14.09(A) (Vernon Supp.1982) provides:
 (A) It is unlawful for any person knowingly to enter into a contract or transaction to print, publish or broadcast, any political advertising which does not disclose thereon that it is political advertising and which does not state thereon the name and address either of the agent who personally entered into the contract or transaction with the printer, publisher, or broadcaster, or the person represented by such agent. A violation of this provision shall constitute a class A misdemeanor.
 
 
 [3]
 The penalty for violating 14.09(B), as noted in footnote 1, is a fine of not more than $100. The penalty for violating 14.09(A) is set by Tex.Penal Code Ann. Sec. 12.21 (Vernon 1974):
 (1) a fine not to exceed $2,000; (2) confinement in jail not to exceed one year; or (3) both fine and imprisonment.
 
 
 [4]
 See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, The Federal Courts and the Federal System 64 (2d ed. 1973)
 
 
 [5]
 Liner v. Jafco, Inc., 375 U.S. 301, 306 & n. 3, 84 S.Ct. 391, 394 & n. 3, 11 L.Ed.2d 347, 351 & n. 3 (1964); see United States v. Johnson, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (per curiam) (collusive case)
 
 
 [6]
 See Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911)
 
 
 [7]
 Railway Mail Ass'n v. Corsi, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072, 2076 (1945)
 
 
 [8]
 Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895, 906 (1979)
 
 
 [9]
 Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962)
 
 
 [10]
 Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669, 674 (1971); see Boyle v. Landry, 401 U.S. 77, 81, 91 S.Ct. 758, 760, 27 L.Ed.2d 696, 700 (1971)
 
 
 [11]
 Cf. City of Los Angeles v. Lyons, --- U.S. ----, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (standing to seek injunctive relief not conferred by injury when possibility of its repetition remote)
 
 
 [12]
 Babbitt, 442 U.S. at 298, 99 S.Ct. at 2308, 60 L.Ed.2d at 906
 
 
 [13]
 Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505, 514 (1974)
 
 
 [14]
 Younger, 401 U.S. at 49, 91 S.Ct. at 753, 27 L.Ed.2d at 678-79; see Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971)
 
 
 [15]
 Because there is no ongoing state proceeding of any sort, we need not be concerned with the "abstention" branch of Younger. See generally Middlesex County Ethics Comm. v. Garden State Bar Ass'n, --- U.S. ----, ---- & n. 14, 102 S.Ct. 2515, 2523 & n. 14, 73 L.Ed.2d 116, 127 & n. 14 (1982); Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975)
 
 
 [16]
 See also Doran v. Salem Inn, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)
 
 
 [17]
 442 U.S. at 298-99, 99 S.Ct. at 2309, 60 L.Ed.2d at 906 (quoting Younger, 401 U.S. at 42, 91 S.Ct. at 749, 27 L.Ed.2d at 674)
 
 
 [18]
 In Babbitt, the Court's analysis focused on whether there was a case or controversy. Its discussion indicated that the standing requirement merged with the necessity for a case or controversy. See 442 U.S. at 299 & n. 11, 99 S.Ct. at 2309 & n. 11, 60 L.Ed.2d at 907 & n. 11
 
 
 [19]
 See Middlesex County Ethics Comm., 457 U.S. at 434-37, 102 S.Ct. at 2523-24, 73 L.Ed.2d at 126-27 (considering event occurring after court of appeals' decision but before filing of petition for certiorari in deciding whether Younger abstention required)
 
 
 [20]
 See also United States v. Grace, --- U.S. ----, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (petitioner had standing to challenge statute forbidding picketing at Supreme Court building after twice being told to cease handing out leaflets on pain of arrest)
 
 
 [21]
 The statute is set forth in full supra at note 1
 
 
 [22]
 This argument is not based on the type of abstention required by Younger, staying federal consideration because state proceedings are actually underway, for there are no state proceedings of any kind. It seeks instead the type of abstention discussed in Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), which is based on the need to allow states to interpret their own statutes, if possible in a manner consonant with constitutional requirements, thus relieving federal courts from unnecessarily confronting constitutional questions
 
 
 [23]
 Brooks v. Walker County Hospital Dist., 688 F.2d 334, 336 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983); see Palmer v. Jackson, 617 F.2d 424 (5th Cir.1980)
 
 
 [24]
 See Ray v. Atlantic Richfield Co., 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179, 188 (1978). Such a conflict exists when compliance with both the state and federal statutes is a physical impossibility or when state law stands as an obstacle to the accomplishment of Congress' purposes and objectives. Id
 
 
 [25]
 See Fidelity Savings & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 152-54, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664, 674-76 (1982) (and cases cited therein); Note, Pre-emption as a Preferential Ground: A New Canon of Construction, 12 Stan.L.Rev. 208 (1959)
 Congress' power to regulate radio and television broadcasting arises from the power to regulate commerce among the states. U.S. Const. art. I, Sec. 8, cl. 3; United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).
 
 
 [26]
 Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); see Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 229-230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947)
 
 
 [27]
 See Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 143-44, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248, 256 (1963)
 
 
 [28]
 See id. at 142, 83 S.Ct. at 1217, 10 L.Ed.2d at 256. The federal intent to preempt must be "clear and manifest." Ray, 435 U.S. at 157, 98 S.Ct. at 994, 55 L.Ed.2d at 188; see Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 613 (1977) ("unmistakably ordained")
 
 
 [29]
 See 47 U.S.C. Sec. 309 (1976). The FCC's explication of the public interest requirement has established standards that broadcasters must meet to renew or secure a license. See Note, The Changing Face of Broadcaster Responsibility Under the Public Interest Standard, 10 Loy.U.Chi.L.J. 115 (1978)
 
 
 [30]
 See id.; 47 C.F.R. Sec. 73.1920 (1981)
 
 
 [31]
 See 47 U.S.C. Sec. 315(a) (1976); 47 C.F.R. Sec. 73.1910 (1981); The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 48 F.C.C.2d 1, 2-3 (1974)
 
 
 [32]
 See Note, supra note 29, at 130; 47 C.F.R. Sec. 73.658(k) (1981)
 
 
 [33]
 See 47 U.S.C. Sec. 315(a) (1976). The equal time rule is meant to facilitate political debate through the media, see Farmers Educational & Coop. Union v. WDAY, Inc., 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959), and requires broadcasters permitting a legally qualified candidate for public office to use its facilities to afford equal time to all other candidates for that office
 
 
 [34]
 47 C.F.R. Sec. 73.1205 (1981)
 
 
 [35]
 Id. Sec. 73.4005
 
 
 [36]
 Id. Sec. 73.1212
 
 
 [37]
 Id. Sec. 73.4015
 
 
 [38]
 Id. Secs. 73.4010, 0.281(a)(7)
 
 
 [39]
 Id. Sec. 73.4070
 
 
 [40]
 Id. Sec. 73.4075
 
 
 [41]
 Id. Sec. 73.4080
 
 
 [42]
 47 U.S.C. Sec. 315(b) (1976). The statute provides:
 (b) The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election to such office shall not exceed--
 (1) during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and
 (2) at any other time, the charges made for comparable use of such station by other users thereof.
 The FCC has devoted considerable attention to defining "lowest unit charge." See, e.g., Law of Political Broadcasting & Cablecasting, 69 F.C.C.2d 2209, 2273-81 (1978) [hereinafter cited as Law of Political Broadcasting ]; Use of Broadcast & Cablecast Facilities by Candidates for Public Office, 34 F.C.C.2d 510, 524-33 (1972) [hereinafter cited as Use of Broadcast & Cablecast Facilities ].
 
 
 [43]
 The FCC has extensively defined "comparable use." See Use of Broadcast Facilities by Candidates for Public Office, 24 F.C.C.2d 832, 877-83 (1970), reaffirmed in Use of Broadcast & Cablecast Facilities, supra note 42, at 533. See also Law of Political Broadcasting, supra note 42, at 2281-86
 
 
 [44]
 See 47 C.F.R. Secs. 73.1940, 76.205 (1981)
 
 
 [45]
 Congress has not enacted a separate requirement for identification of sponsors of broadcast political advertising, but has instead relied on the general sponsor identification requirement applicable to all advertising. See 47 U.S.C. Sec. 317 (1976); 47 C.F.R. Sec. 73.1212 (1981)
 
 
 [46]
 Joint Agency Guidelines for Broadcast Licensees re Political Broadcasting, 69 F.C.C.2d 1129, 1131 (1978) (footnotes omitted) [hereinafter cited as Joint Agency Guidelines ]
 
 
 [47]
 Law of Political Broadcasting, supra note 42, at 2304-05
 
 
 [48]
 Id. at 2302 (emphasis added)
 
 
 [49]
 See New York State Comm'n on Cable Television v. FCC, 669 F.2d 58 (2d Cir.1982); Brookhaven Cable TV v. Kelly, 573 F.2d 765 (2d Cir.1978), cert. denied, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979)
 
 
 [50]
 If the broadcast is authorized and financed by a candidate or committee, the federal requirement is satisfied by the statement: "Paid for by [name of candidate or committee]." Joint Agency Guidelines, supra note 46, at 1130; see also In re Notice to Canadian River Broadcasting Co., 68 F.C.C.2d 1491, 1491 (1978) (sponsorship identification requirement violated by commercial identified as "paid for by concerned citizens"); Applicability of Sponsorship Identification Rules, 53 F.C.C.2d 368, 368 (1975) (statement that commercial is "paid political announcement" violates identification rule); In re Liability of Zion-Benton Broadcasting Corp., 43 F.C.C.2d 633, 633 (1973); see generally In re Amendment of the Commission's Sponsorship Identification Rules, 52 F.C.C.2d 701 (1975). The Texas statute requires in addition the candidate's or committee's address and the notation that the commercial is a paid political announcement. The fact that Texas compliance does not preclude federal compliance, however, does not validate its application to federal candidates. As pointed out above, if federal regulation preempts state law, the state may not legislate even to complement federal enactments
 
 
 [51]
 See Application of Sponsorship Identification Rules to Political Broadcasts, Teaser Announcements, Governmental Entities & Other Organizations, 66 F.C.C.2d 302, 304 (1977)
 
 
 [52]
 Smith v. Pingree, 651 F.2d 1021, 1025 (5th Cir.1981); see Pharmaceutical Society of New York, Inc. v. Lefkowitz, 586 F.2d 953, 958 n. 6 (2d Cir.1978)
 
 
 [53]
 See supra notes 42-43
 
 
 [54]
 In re Public Notice Concerning Licensee Responsibility Under Amendments to the Communications Act Made by the Federal Election Campaign Act of 1971, 47 F.C.C.2d 516, 518 (1974) (emphasis added); see In re Amendment of Parts 73 & 76 of the Commission's Rules Relating to Broadcasts & Cablecasts by Legally Qualified Candidates for Public Office, 68 F.C.C.2d 1049 (1978) (any person who has publicly announced intention to run for any public office is covered by statute)
 
 
 [55]
 Section 315(b) applies to any person who is "a legally qualified candidate for any public office." (emphasis added). When Congress wished to limit its regulation to candidates for federal office, it said so explicitly. See, e.g., 47 U.S.C. Sec. 312(a)(7) (1976); 2 U.S.C. Sec. 431(2) (Supp. V 1981)
 
 
 [56]
 In re Request by Station WBGR, 58 F.C.C.2d 980, 980 (1976) (emphasis in original)
 
 
 [57]
 Use of Broadcast & Cablecast Facilities, supra note 42, at 531
 
 
 [58]
 S.Rep. No. 96, 92d Cong., 1st Sess. ---- (1971), reprinted in 1972 U.S.Code Cong. & Ad.News 1773, 1775
 
 
 [59]
 In re Request by Reagan for President Comm. for Declaratory Ruling, 80 F.C.C.2d 225, 227 (1980); Campaign '76 Media Communications, Inc. v. Stations WGN & WGN-TV, 58 F.C.C.2d 1142, 1144 (1976). See Hernstadt v. FCC, 677 F.2d 893, 897, 901 (D.C.Cir.1980) (purpose of statute is to lower amount spent on media advertising by giving candidates additional discount during pre-election period while continuing to make comparable rates available during other periods )
 
 
 [60]
 S.Rep. No. 96, supra note 58, at ----, reprinted in 1972 U.S.Code Cong. & Ad.News 1773, 1781 (emphasis added); see also S.Rep. No. 229, 92d Cong., 1st Sess ---- (1971), reprinted in 1972 U.S.Code Cong. & Ad.News 1821, 1855 (views of Sens. Prouty, Cooper, & Scott) (encouragement of shorter campaigns)
 
 
 [61]
 S.Conf.Rep. No. 580, 92d Cong., 1st Sess. ---- (1971), reprinted in 1972 U.S.Code Cong. & Ad.News 1866, 1867 (emphasis in original)
 
 
 [62]
 See In re Request by Reagan for President Comm. for Declaratory Ruling, 80 F.C.C.2d 225 (1980). In that case the Commission overturned precedent holding that "caucuses" were not "primary elections"; candidates running in such caucuses were not, before this decision, entitled to receive a station's lowest unit charge during the 45-day window before the caucus. The FCC concluded that the Iowa caucuses, for which candidate Reagan sought to advertise at the lowest unit rate, were in effect "primaries." The Commission, however, made its ruling prospective in effect to avoid "considerable disruption to all concerned ...." Id. at 228
 
 
 [63]
 Section 315 does not apply to political broadcasts by "groups, organizations or persons other than candidates. [It] applies only to broadcasts by candidates for public office." Use of Broadcast & Cablecast Facilities, supra note 42, at 529
 
 
 [64]
 One of the reasons Congress settled on the lowest unit rate was to avoid the possibly devastating economic impact on small stations of a fixed discount for political advertising. See S.Rep. No. 96, supra note 58, at ----, reprinted in 1972 U.S.Code Cong. & Ad.News 1773, 1780 (lowest unit charge "makes use of each broadcaster's own commercial practices rather than imposing on him an arbitrary discount rate applicable to all stations regardless of their differences"); Hearings on S.1, S.382, and S.956 Before the Subcomm. on Communications of the Senate Comm. on Commerce 412 (1971) (remarks of Sen. Pastore). Texas' statute certainly conflicts with this purpose because it imposes a year-round discount instead of the limited discount Congress enacted
 
 
 [65]
 Section 315 does not require broadcasters to give nonfederal candidates access to their stations. The courts and the FCC have consistently held that broadcasters may deny such access provided that their coverage of nonfederal elections satisfies their "public interest" obligation. See CBS, Inc. v. FCC, 453 U.S. 367, 379 & n. 6, 101 S.Ct. 2813, 2821 & n. 6, 69 L.Ed.2d 706, 718 & n. 6 (1981); Hernstadt, 677 F.2d at 903 & n. 26; Felix v. Westinghouse Radio Stations, Inc., 186 F.2d 1, 5 (3d Cir.1950), cert. denied, 341 U.S. 909, 71 S.Ct. 622, 95 L.Ed. 1347 (1951); Law of Political Broadcasting, supra note 42, at 2223, 2290. If a station permits nonfederal candidate access, however, it immediately becomes subject to the statute's "equal opportunity" provision, requiring it to make time available to all candidates for the office. The Texas statute, by requiring broadcasters to furnish such "equal time" on a lowest unit charge basis year-round, might cause stations simply to refuse to broadcast any political advertising. This result would directly thwart Congress' intent in passing Sec. 315(b)(1) to give candidates greater opportunities to gain access to the broadcast media
 
 
 [66]
 American Party v. White, 415 U.S. 767, 782 n. 14, 94 S.Ct. 1296, 1307 n. 14, 39 L.Ed.2d 744, 761 n. 14 (1974); see Anderson v. Celebrezze, --- U.S. ----, ---- & n. 9, 103 S.Ct. 1564, 1570 & n. 9, 75 L.Ed.2d 547, 557 & n. 9 (1983)
 
 
 [67]
 Anderson, --- U.S. at ---- n. 9, 103 S.Ct. at 1570 n. 9, 75 L.Ed.2d at 557 n. 9